## James Owens, Sr. *vs.* Leonard Mackall.

### *Partnership.*

A partnership was formed between J and E, and the business conducted for some time, when in 1842 J died, leaving a will by which he appointed his wife, E, his partner, and M, his executors, to whom he devised his entire estate in trust for certain purposes. He directed that the business should be conducted after his death by E, and that the trustees under the will should not withdraw from the business of the firm any part of the capital which he had invested therein, unless it was necessary for them to do so in payment of his debts. The business was continued by E, according to the directions of the testator until 1857, when T was taken into the firm, and an article of agreement entered into between E acting in his own right, and jointly with the widow of J and M, trustees under the will, and T, by which it was provided that the business should be carried on under the old name and should continue for a specified time—the net profits were to be divided into three equal parts, one of which was to go to E in his own right, one to the trustees under the will of J, and the remaining part to T. It was also provided that in case of the death of E, his "executors or trustees or both" should hold the same relation to the business of the firm as he did in his life time. This agreement was assented to by the heirs-at-law of J. Subsequently the widow of J died, and in 1862 the article of agreement was continued for seven years from its date, by E acting for himself and jointly with M as surviving executors and trustees of J, and by T. This contract was also assented to by the children of J. E died leaving a will by which he provided for the continuance of his interest in the business. He appointed O and D his executors—the latter renounced and the former became sole executor. The business was carried on in the same name and at the same place until 1868, when the firm failed. An action was brought by O, a creditor of the firm, against M seeking to charge him as a partner for the debt. M never participated in any way in the management of the business of the firm, nor exercised any control or supervision over the same, nor received any portion of the profits thereof directly or indirectly ; and never gave any authority for the continuance of the firm after the death of E. Held : ˙

That M was not a partner in the firm, and was not personally liable, as a partner, to a creditor of the firm.

Appeal from the Baltimore City Court.

The case is fully stated in the opinion of the Court.

*Exception:* The plaintiff offered the following prayer, which was rejected:

That by the true construction of the two papers offered in evidence by the plaintiff, dated 30th of October, 1857, and 29th of March, 1862, the defendant Mackall became a partner in the firm of J. W. & E. Reynolds & Co., mentioned in said papers, it being admitted that said papers were signed by Mackall and the other parties therein.

The defendant offered three prayers; the second and third were rejected; the first as follows, was granted:

If the jury find that the defendant never in any way participated in the transaction of the business of the firm of J. W. & E. Reynolds & Company, or exercised any control or supervision over the same in any way, or received any portion of the profits thereof directly or indirectly, or was held out or held himself out as a partner of the said firm otherwise than by the execution of the two agreements which have been offered in evidence by the plaintiff. And shall further find that the plaintiff in his dealings with the said firm which are in controversy, knew the relations of Mackall thereto, but did not regard him as a partner therein personally responsible, or rely upon the personal credit of the said Mackall, but on the contrary knew him to have no personal interest in the profits of the concern, and knowingly dealt therewith exclusively upon the faith and credit of the other parties in the said firm and not on that of said Mackall, and did not in his said transaction hold or mean to hold said Mackall as liable to him thereupon, that the plaintiff is not entitled to recover against this defendant in this action.

To the rejection of his prayer as also to the granting of the defendant's first prayer, the plaintiff excepted, and the judgment being against him he appealed.

The cause was argued before Bartol, C. J., Maulsby, Miller and Alvey, J.

*Levin Gale* and *Reverdy Johnson,* for the appellant,

Argued that the articles of co-partnership offered in evidence, constituted Mackall a partner in the firm, and that he became liable to the creditors thereof, whether he *actively participated* in the business or not.    And in support of this view the following authorities were referred to : *Bissett on Partnership, secs.* 16–20 ; *Parsons on Part.,* 450–455 ; *Story on Part., secs.* 70–106 ; *Collyer on Part., sec.* 604 ; 3 *Kent's Comm.,* 33 ; *Thompson vs. Brown,* 4 *John., Ch. Rep.,* 628 ; *Wightman vs. Townroe et al.,* 1 *Maule & Selwyn,* 412 ; *Alsop vs. Mather,* 8 *Conn.,* 587.

*Robert A. Dobbin* and *S. Teackle Wallis,* for the appellee.

The appellant's prayer was properly rejected, because it required the Court to determine the appellee's relation with the firm of J. W. & E. Reynolds & Co., from the two papers referred to in said prayer, alone, unconnected with the will under which they were made, unaffected with the testamentary system of the State, and without regarding the actual facts of the appellee's connection with the firm, or the other facts proven, under which the appellee was not in fact a partner.    *Code, Art.* 93, *sec.* 13 ; *Albert and wife vs. The Savings Bk.,* 2 *Md.,* 160 ; *Miller & Mayhew vs. Williamson,* 5 *Md.,* 219 ; *Lowrey vs. Commercial Bank,* 3 *Bankers' Mag.*; *Bullen vs. Sharp,* 1 *Law R.,* 86 ; *Cox vs. Hickman,* 8 *H. L. C.,* 268 ; *Story on Part., sec.* 49 ; *Eden Bank, Ch.* 5, 34 *L. L.,* 22 ; *Parsons on Part.,* 145, 146, *and notes.*

The appellee's prayer was properly granted, because, upon its hypothesis, the appellee was not a partner in law or fact as to the appellant.    The undisputed proof shows that the appellant dealt with the firm exclusively on the credit of the other parties sued as members thereof, and not upon that of the appellee, and this with full knowledge of the facts of the case, never considering or meaning to consider the appellee liable as a member of the firm.    *Maltby vs. N. Va. R. R. Co.,* 16 *Md.,* 443 , *Matthews vs. Dare,* 20 *Md.,* 273 ; *Giddings vs.*

*Seevers,* 24 *Md.,* 363; *Bromley vs. Elliott,* 38 *N. H.,* 309; *Hastings, et al. vs. Hopkinson, et al.,* 28 *Vermont,* 108.

MAULSBY, J., delivered the opinion of the Court.

The facts of this case are that in 1841, and prior thereto, Joseph W. Reynolds and Edward Reynolds conducted business in the City of Baltimore, as partners, under the name of Jos. W. & E. Reynolds & Co.—that in 1841 Joseph W. died, leaving a last will and testament, by which he appointed his wife, Ann Reynolds, the said Edward Reynolds, and Doctor Leonard Mackall, executors of his will, and devised to them all his estate, in trust for the uses and purposes declared, one of which was contained in this clause: " Item—Whereas, my nephew " (the said Edward) " has generously offered to continue the business of the firm of Jos. W. & E. Reynolds, and divide the profits between himself and my family, as they are now divided between himself and me, therefore it is my will and desire that the said business be continued by him after my death, and that my trustees leave in said firm a capital, belonging to my estate, of five thousand dollars; and whereas I have in said business a capital exceeding ten thousand dollars, I do not wish my trustees to withdraw any part of the same, but as it may be necessary for them to do, as my executors, in payment of my debts." Another clause of the will was: " My sons being all young, and although steady and promising now, I know not how they may turn out to be, and the better to provide for my dear wife, are the motives of my appointing trustees, together with securing the property of my daughters."

The business was continued, according to the directions of the will, by Edward Reynolds until October 30th, 1857, when Thomas B. H. Turner was taken into the firm, and an article of agreement was entered into between Edward Reynolds, acting in his own right, and jointly with Ann G. Reynolds, (the widow called Ann in the will,) and Leonard Mackall, *trustees under the will of Joseph W. Reynolds,* and

Thomas B. H. Turner, by which it was provided that the same business was to be carried on under the name of Joseph W. & Edward Reynolds & Co.; that this partnership was to be computed to commence on the 1st day of January, 1854, and to continue seven years from that date, and that the net profits were to be divided into three equal parts, one of which should go to said Edward Reynolds, in his own right, one part " *to the trustees aforesaid,*" and the remaining part to the said Turner. It was further provided that in case of the death of Edward Reynolds his " executors or trustees, or both," should hold " the same relation and power in regard to the co-partnership matters and business of said firm, as the said Edward Reynolds did in his lifetime."

Subscribed to this agreement was the following: We, the undersigned, Thos. Reynolds, Harriet G. Reynolds, and Jas. W. Reynolds, heirs-at-law of the late Joseph W. Reynolds, do hereby ratify and confirm the foregoing agreement of co-partnership.

Witness our hands and seals the day of the date of said agreement.

THOMAS REYNOLDS,     [*Seal.*]
HARRIET G. REYNOLDS,   [*Seal.*]
JAMES W. REYNOLDS,     [*Seal.*]

On the 29th of March, 1862, Edward Reynolds for himself, and Edward Reynolds and Leonard Mackall, surviving executors and trustees of Jos. W. Reynolds, deceased, and Thomas B. H. Turner, executed another agreement, reciting the foregoing, and the death of said Ann G., and that the foregoing agreement provided for the continuation of the partnership in case of the death of either of the parties, and providing for the continuation of the partnership for seven years, and that in case of the death of any of the parties, the partnership should be again renewed, and that the executors, administrators, trustees, or other legal representatives of the parties dying, should have full power to renew and con-

tinue the partnership.   This contract, like the preceding, was assented to by the representatives, the children, of Joseph W.

In 1862, Edward Reynolds died, leaving a last will, by which he appointed William A. Dunnington, and the appellant in this case, executors and trustees thereunder, and the sixth clause was: " I contemplate increasing my interest in the firm of J. W. and E. Reynolds & Co. to an amount not exceeding ten thousand dollars beyond my present interest in said firm.   Should that not be done by me in my lifetime, in whole or in part, I hereby empower and direct my executors and trustees to carry out the same, by paying over to said firm the sum of ten thousand dollars, or so much as may be required, in addition to any advance made by me in my lifetime to that view, to make up the sum of ten thousand dollars, provided my executors and trustees shall deem the same advisable and judicious."   Dunnington renounced, and the appellant became sole executor and qualified.   There is proof that business was carried on in the same name, at the same place, until the winter or spring of 1868.

There is also proof that the appellee never took any part in, or intermeddled, in any way, with the business of the firm. A witness, who was book-keeper, cashier and salesman from 1853 to 1857, proves that he never saw the appellee about the business office of the firm, nor heard of him in connection with the business; never knew him to share in the profits, nor participate, in any manner, in the management of the affairs of the firm.   Another witness, who was book-keeper from 1856 to 1867, proves that the appellee did not, during that time, in any way, participate in the management, control or profits of the business, and that he never heard his name mentioned in connection with the firm or its affairs. And another, who was book-keeper from September, 1866, to June, 1868, that he had never known or heard of the appellee as, in any way, connected with the firm, its business or profits.   There is further proof that the appellee never, at any time, took any part in, or exercised any control over, the

management of the affairs of the firm; that he had never seen any of its books, nor ever had any business whatever with the firm. And further, that the appellant had said that he knew that the appellee never had anything to do with the business, and was not liable for the debts of the firm; that he knew that he never had any connection with the firm; and after suit brought, the appellant said he would go and have the appellee's name stricken out of the suit, because he knew that he was not responsible for the debts. There is no conflicting proof.

There was also proof that the appellee had never given any authority for the continuance of the firm after the death of Edward Reynolds in 1862. The death of Edward put an end to the partnership then existing, by operation of law. There was no proof tending to show that, after the death of Edward, the appellee had entered, in any character, into another contract of partnership. The terms of the contract of 29th March, 1862, in respect to a continuation of the partnership, are: "And further, it is declared to be the intention of the parties hereto, that if, at the expiration of this contract, any of the parties hereto may have departed this life, the partnership hereby continued, shall be again renewed, upon such terms as may be agreed on by the surviving partner or partners, and the representatives of the one or more of them so having died, and full power is hereby given to the executors, administrators, trustees, or other legal representatives of the parties, to renew and continue the aforesaid co-partnership." No agreement was made by the appellee after the death of Edward; and there is nothing to relieve this case from the operation of the rule, that the death of one partner operates as a dissolution with respect to the whole, notwithstanding it is entered into for a term of years, unless provision is expressly made to the contrary. In this contract no provision to the contrary was made.

On these facts, the appellant offered one prayer, and the appellee three, the last providing for the contingency of the

appellant's prayer being granted. The prayer of the appellant was rejected, and the first prayer of the appellee granted, the third falling with the rejection of the appellant's, and the second rejected.

We are called upon to pass on an exception by the appellant to the rejection of his prayer, and to the granting of the first prayer of the appellee.

We do not concur in the proposition contained in the appellant's prayer, which is that the simple execution of the two contracts mentioned in it, by and of itself, and without reference to anything else, constituted the appellee a partner in the firms mentioned in those contracts, and rendered him liable as such. Those papers, on their face, describe him as trustee under the will of Joseph W. Reynolds. To an understanding of his intention in executing the papers, it is indispensable to look to the will referred to, in order to ascertain what the trust was — to see what the appellee in fact proposed to do. The first principle, underlying a partnership, is the consent of the parties to its formation — *delectus personæ* — and that consent must be signified in some way, by writing, by parol or by acts. It may be express, or it may be implied by law, but there must be a consent apparent. It is not necessary to make a party a partner, so as to be liable to third persons for the debts of a partnership, that he shall have an interest in the firm profits; but if he lend his name, as a partner, he becomes liable upon principles of general policy, to prevent the frauds to which creditors would be exposed, if they supposed that they were lending their money to three or four persons, when in fact they were lending to only two or three of them. But, lending his name is his act, and evidences his consent. So a party may do an act from which the law will imply his consent to be answerable to creditors of a firm, without his intending that such a consequence shall follow his act; but still he must do the act or consent cannot be implied. Whether the execution of the contracts in question be, or not, such acts as the law will

therefrom imply, the appellee's consent to become liable as a partner, must depend on the circumstances developed by those papers, and by the other paper referred to by them, and, in this case, from other facts and circumstances in proof. The other paper is the will of Joseph W. Reynolds, and to ascertain the nature and character of the appellee's acts in signing the contracts, the will must be looked to. By that he is directed not to withdraw from the business of the firm any part of the testator's funds invested in it, except such as may be necessary to pay his debts; and the testator's object, in giving this direction, is declared to be, that the profits of the business may continue to be divided between Edward, and the family of the testator, after his death, in the same manner as they were divided at the date of the execution of the will, between Edward and the testator. In both the contracts, the appellee declares that he executes them as trustee under this will, and the just construction of all the papers shows that he is carrying out the trust, to wit, that the profits may be divided with the family of Joseph W. Reynolds. The appellee does not appear to be devising a way of his own to benefit the family of the testator, but simply obeying the directions of the will under which he acts. A ratification of both the contracts, by the family of Joseph W. Reynolds, is subscribed to them. The appellee did no act, holding himself out to the world as a partner, or connecting his name with this firm, except the act of signing those contracts. No creditor of the firm could know that the name of the appellee was connected with it, in any way, directly or indirectly, unless by reading the contracts, and on reading them, he would discover the true facts surrounding the transactions, and that the appellee was not participating, for his own benefit, in the profits of the partnership, nor holding himself out as a partner, but simply discharging an expressly declared trust, and that the actual partners in interest were, so far as the appellee was concerned, "the family" of Joseph W. Reynolds.

It is said in the text books, and was insisted on by the appellant's counsel, that the rules as to partnership liability apply, with full force, although the party is not personally interested, but only as trustee, executor or administrator for the use and benefit of others; and even though he does not interfere except in settling the accounts; and the authorities referred to in all the text books are the cases of *Weightman vs. Townroe*, 1 *Maule & Selwyn*, 412, and *Ex parte Garland*, 10 *Vesey*, 109, and *Barker vs. Parker*, 1 *Term Rep.*, 287.

*Weightman vs. Townroe*, was a case where the executors of a deceased partner continued, of their own motion, his share of the partnership property in trade, for the benefit of his infant daughter. They were not directed to do so by the will, but acted *bona fide* for the benefit of the testator's daughter. Lord ELLENBOROUGH said, "the fund subsisting at the death of the testator, under a due administration of the will, should have been disposed of by the executors, and converted into money, and distributed as assets. Instead of that it is embarked *de novo* in the trade, in the purchase of other barley, and a variety of other contracts, to which the infant is not privy, nor bound by them, but may renounce when she comes of age, as *damnosa hæreditas.* If then the infant has such an option, who but the executors can be liable?" And BAYLEY, J., said, "the executors in this case are mere volunteers. At law they became the legal proprietors in respect of everything belonging to the trade; and consequently are liable to the legal debts."

It is clear that the ground of the judgment, in this case, was the volunteer and unauthorized act of the executors, well intended, but still violative of their duty as executors. It was their act of embarking in the firm as partners, although the fund which they embarked was that of the estate, and their object was the benefit of the infant child of their testator; still it was their act that made them liable, which act it was not their duty to do.

. In this case the appellee did no act of his own motion, except to carry into effect that, which the declaration of his trust commanded, not to be sure, in so many words, that he should execute the contracts, but to enable the partnership business to be carried on *by* Edward Reynolds, who, by the terms of the will, was to carry it on, and by Edward Reynolds and Turner, when Edward Reynolds deemed that desirable; and that he did so, is evidenced by the terms of the contract of March, 1862, in order that "*the family*" of Joseph W., might participate in the profits of the business, the object declared by the will.

In the case in 10 *Vesey*, Henry Ballman bequeathed his estate to his wife Margaret, and three other persons, in trust, &c. He directed that his trade should be carried on by his wife, the profits to be applied to her own use, and the maintenance and education of his children, and that the trustees should pay her six hundred pounds out of his personal estate, to enable her to carry on the business. She did carry on the business and became a bankrupt. The testator had directed that a valuation should be made of the stock and effects in his trade, and that the wife should give to them her notes for the amount thereof, and also for the six hundred pounds. The other executors and trustees had advanced to her the further sum of £768, 12s and 4d, of the assets of the estate. The question arose on proving these several claims under the commission. The points made by the assignees were, that the surviving trustee, as a creditor on the notes, ought to be postponed to all the other creditors of the bankrupt, and, secondly, that the general assets of the testator were subject to the bankruptcy. The Lord CHANCELLOR decided the first point in favor of the assignees, and on the second point, he finally allowed the proof of the £768, 12s and 4d, to stand against the bankrupt's estate; or, that the general assets of the testator were not subject to the bankruptcy.

In the argument of the cause it was said "if an executor is directed to carry on the trade, and does so, he must make

himself personally liable to the whole of the debts contracted in that trade," and the case of *Hankey vs. Hammond*, decided by Lord KENYON, was cited. It was then argued that the executor must have the right of resorting for his indemnity to the whole personal estate given to him with the direction to carry on the trade.

In delivering his judgment the Lord CHANCELLOR used the expressions quoted in the text books, but it is manifest that they were not used in reference to any such case as the present, and they do not support the position contended for by the appellant. The inquiry was, as to the liability of the general assets of an estate for debts, contracted by an executor, who had carried on a business in his own name, or in his own person, having been authorized by the will to do so; and the language used by the Lord CHANCELLOR was used in illustration of his views on that point. Finally he decided, that only the property embarked in the trade should be answerable to the creditors of the trade.

If this case could be held to decide anything touching the case we are considering, it would seem to be that creditors of the firm of Joseph W. and E. Reynolds & Co., would be entitled, so far as the estate of Joseph W. Reynolds and this appellee are concerned, to only the property declared to be embarked in the partnership, that is, to the estate of Joseph W. Reynolds, and not to any claim against the appellee personally.

But the primary object in examining it, has been to show that it cannot be taken as authority for the proposition contained in the appellant's prayer.

*Hankey vs. Hammond*, referred to in this case, and, in a note, said to have been cited by the Lord CHANCELLOR from his manuscript note of it, has been found reported in 1 *Buck's Cases in Bankruptcy*, 210. It is, that Jackson, a corn chandler and lighterman, by his will devised and bequeathed the residue of his estate, real and personal, to his wife, for her own use for life, and desired that she should carry on his trade

and business for the benefit of herself and children; and after other directions, directed that if, on an examination, it should be found that the trade was declining and in a losing way, the said residue should be sold, except the leasehold buildings, and they rented, and the proceeds of sale and the rents invested for the benefit of his·wife and children, and appointed Ruse and Jackson executors. The widow carried on the trade for two years, when the executors found that it was a losing concern, and possessed themselves of the stock and effects of the trade. In the meantime the widow had become indebted. This was a proceeding by creditors to obtain payment of their debts. Accounts were directed to be taken of the value of the stock in trade and effects belonging to the testator at his death, possessed by the executors, and also how much of said stock and effects, possessed by the executors, had been acquired by the widow in the course of carrying on the trade or business by her. Lord KENYON decided that the value of the stock in trade, effects, &c., which had been acquired by the widow in the course of carrying on the business, and of which the executors had possessed themselves, should be first applied to the payments of the debts incurred by her, and that any deficiency should be paid out of the assets of the testator.

This report of the case shews that it does not sustain the proposition for which it was cited by counsel in the case *ex parte Garland*, 10 *Vesey.* No question appeared touching the personal liability of the executors, but on the contrary, it simply appropriated the assets of the testator to the payment of the debts of the trade, carried on by direction of the will ; and like the case in 10 *Vesey*, if it shew anything touching this case, it would be that creditors of the firm of Jos. W. & E. Reynolds & Co. are entitled to look to the estate of Jos. W. Reynolds.

We have not been able to find any English or American authority to sustain, when examined, the proposition that the execution of an article of partnership by an executor, or trustee, *ipso facto*, renders him personally responsible, without

reference to other facts and circumstances attending the transaction.

The case of *Thompson, et al. vs. Brown, et al.*, 4 *Johnson Ch. Rep.*, 619, was where the administrators of a deceased partner entered into articles of co-partnership with the surviving partner, on the same terms existing between the surviving and deceased partners, by which the partnership was to continue until it might be mutually dissolved. They did so, not for their own benefit, but for that of the estate. Still it was their act. They were not in the discharge of a trust enjoined on them, as in this case. Besides the goods on hand at the death of their intestate, they advanced to the firm some cash belonging to the estate. A judgment was recovered against the surviving partner, and a bill filed seeking to make the administrators liable for the value of the moiety of the goods belonging to the deceased partner at his death, and for the cash advanced to the firm. The Chancellor held them responsible for the cash advanced, but refused to hold them liable for the value of the goods, on the ground that they had acted in good faith. In this case the administrators were personally liable for the debts of their own partnership, because they had, of their own volition, entered into a partnership. The undertaking was their own, not for their own advantage it is true, but still they were partners to all the world, and by their own contract. It is this character of case in which Courts of Chancery, it is said, will sometimes appoint a trustee to carry on a trade for the benefit of an infant. That is, where the infant inherits an interest in an existing trade, which cannot be discontinued without detriment, and where it may appear to the Court that the best interests of the infant demand that the partnership be continued, or rather a new partnership formed for the continuation of the trade. And this is the character of case spoken of by Lord MANSFIELD in *Barker, &c., vs. Parker*, 1 *Term R.*, 287, (*Marg.*,) when he said : " Executors *eo nomine* do not usually carry on a trade; if they do so, they run great risk; and without the

protection of a Court of Chancery, they would act very un-wisely in carrying it on." And again, " If executors carry on a trade, they must do it as individuals, for their own ad-vantage. I remember many instances of trade being carried on under the direction of the Court of Chancery." In that class of cases no trust exists to carry on the partnership, and if the executor choose to do it, of his own accord, for the benefit of the estate he represents, whilst, by the act, he makes himself liable to creditors of the firm, and a Court of Chan-cery will protect him as between himself and the estate, according to his prudence and *bona fides*, he may protect him-self against creditors by applying to a Court of Chancery, and inducing it to create a trust. Where, in a case like this, a trust is created by the will, and the executor does no act, save only to obey the declaration of the trust—does not create a partnership, but only carries out the directions of the will in regard to it—in other words does only that which a Court of Chancery would, not permit, but compel him to do, or re-nounce his trust, so that another could be appointed to do the same thing, we can discover no principle which would bind him, individually, as a partner. That which a Court of Chancery would have compelled him to do, if applied to, must be entitled to the same protection, as if he had been compelled to do it. Indeed the only purpose that could be accomplished by application to Chancery, in the class of cases mentioned, would be to have a trust declared. In this case the trust is as fully declared by the will as it could be by any decree. And as in the case of a trustee under a decree, the creditor trusting the firm would be bound by notice of the decree, and a Court of Law would notice and conform to it in administering its remedies; so in this case, the creditor has notice of the trust declared by the will, because the very con-tract signed by the appellee, and offered in evidence by the appellant, expressly refers the very act of the signature, and the character of the appellee in making it, to the will declar-ing the trust; and a Court of Law will recognize it, just as it would recognize a decree in the former case.

If the case were that of a party actually carrying on the business, and holding himself out to the world as a partner, or who could be proved to be a partner by any other proof than the production of the contract itself, and with, and attached to, and part of it, the will declaring the trust, the case might be different. The creditor might not be necessarily affected with notice of the trust, and of its character. In that case, a plaintiff creditor might be entitled to recover, unless express notice of the trust could be brought home to him. In this case, the proof carries the full notice of the trust, and of the capacity in which the appellee acted, home to the appellant.

The case of *Barklie vs. Scott*, 1 *Hudson & Brooke*, 83, is very strong, if not absolutely conclusive, authority in this case. To estimate its full bearing on this case, the whole report of it ought to be read, a brief condensation of which is all that can be attempted in the limits of an opinion, already extended, perhaps, too much.

The defendant was the owner of untenanted store houses in Sligo, and determined to set up two young men in business, to be carried on in them. He also advanced £1,000, as capital, in the name of his infant son, and the contract was that the young men, John Scott and Patricksen, should account for the profit or loss, on this proportion of the capital to the defendant, as trustee for his infant son, and that they should be governed and directed by the advice of the defendant, and a Mr. Ponsonby Shaw, in all matters relative to the business. It was in proof that the defendant took a very active part in the management of the concerns of the partnership, by guaranteeing their payments, and buying and selling for them. The concern became bankrupt, and an action was brought by a creditor to charge the defendant as a partner. It was also in proof, that the £1,000 was advanced by the defendant for his son, as the property of the son, and that the firm would not have paid it back to the defendant, and that he had no right to withdraw it; and that there were profits real-

ized in the first years of the partnership, but that the defendant never received them; that they were retained in the firm, and that they were credited on the books of the firm, "Samuel Scott, on behalf of his son, S. P. Scott, a minor."

The question was, whether the defendant was a partner. The Judge charged the jury, that "if a parent deposit a sum of £1,000 in a partnership concern, as a capital for an infant son, and reserve no power over either it or the profits, he does not thereby make himself liable as a partner," but that "if a person wanting to put money into trade, for his own benefit, embark a sum of money in a partnership concern, in his son's name, reserving to himself the power of drawing it or any profits out, there could be no question that a person so acting would be liable as a partner," and finally, "that if, upon the entire of the case, they should be of opinion that the defendant did not reserve to himself, and had not any right to or control over the sum of £1,000," they should find for him. To this, plaintiff's counsel objected that the Judge himself was bound to put a construction on these instruments, (the letters in evidence, containing the contract between the parties and the defendant,) and to say that the defendant had thereby made himself liable as a partner, and to direct the jury to find for the plaintiff. This the Court refused, but gave leave to move that a verdict be entered for plaintiff, if the Court should be of opinion that he ought so to have directed the jury. The Court of King's Bench, in Ireland, in reviewing the direction of the Judge, delivered an elaborate opinion, almost the whole of which is pertinent to the question in this case, but brief extracts from which can only be given here, one of which is: "Whether that direction was right or not," "depends on the relationship between the parties, to be collected from the letters written to the defendant and P. Shaw, in the commencement of the partnership, and the letter written on P. Shaw's withdrawing his son from the firm in July, 1820, *as well as from the acts of the*

*parties.*" The letters referred to are the same mentioned in the objection of plaintiff's counsel.

Another extract is : " It is to be considered what were the rights of the infant, of the defendant, of the partner, and of the public dealing with the firm. As to the infant, he had a right to the gift made him by his father, but subject to the qualification that it should be a share in the partnership, and subject to the terms of the letter of the 6th August, 1818. If the father had died, his executors could not have had any claim to any part of this sum ; the guardian of the son's fortune could have no claim until the partnership had expired, and then only subject to the qualification as to the losses. This entirely distinguishes the present case from the case, where investments have been made in partnerships, by executors, of the property to which infants are entitled under the wills of their testators ; there the legal interest is in the executors, and the persons beneficially entitled cannot be affected by their act, or made liable to any loss." "As to the world dealing with this firm, the son's share being liable to loss to the amount of the £1,000, there is an equivalent for his being entitled to a share of the profits." As to the defendant, the Court held that he was not liable, because, amongst many other reasons assigned, it did not follow necessarily, from the stipulation, that the firm was to account to him for the profits, as trustee for his son, that anything should be paid to the father by reason of that accounting ; that the jury had found that he did not reserve any power over the capital, and that it was perfectly consistent that the profits should be left to fructify in the house ; and that it did not follow that they were to be paid over to the father on the termination of the partnership. "As to the stipulation that the house should be governed and directed by the defendant's advice, that does not constitute him a partner, nor give him any legal interest in the firm." " But the question of partnership does not depend upon the letters alone ; this is not the case of a single agreement which is not to be explained,

altered or added to by parol evidence, but it is a dealing of mercantile parties with the world, in which the transactions of the parties are admissible in evidence, even against the terms of the original agreement." The application of most of the principles of this decision to the case before us, is, we think, manifest:

The case of *Alsop vs. Mather*, 8 *Conn.*, 584, is not in point. In the Court's opinion, reference is made to *Wightman vs. Townroe*, 1 *Maule & Selwyn*, which has been examined.

We think that there is no such rule, as that contended for by the appellant, governing all cases, without regard to the particular circumstances of each case.

The case of the appellee was put in argument, and might be put in this opinion, on other additional grounds quite sufficient to sustain it; but as, in our opinion, the appellee was not a partner in the firm in question, and was not personally liable, as a partner, to creditors of the firm, and the action of the appellant cannot be maintained, and as this opinion has already grown to great length, generally very undesirable, it would seem to be better not to extend it further by investigations not essential to the determination of the case.

We think that the prayer of the appellant was properly rejected by the Court below, and that of the appellee properly granted, and the judgment will be affirmed.

*Judgment affirmed.*

(Decided 21st December, 1870.)